# EXHIBIT  A

TO PLAINTIFF'S ATTORNEY: PLEASE CIRCLE TYPE OF ACTION INVOLVED: —
TORT — MOTOR VEHICLE TORT — CONTRACT —
EQUITABLE RELIEF — OTHER

## COMMONWEALTH OF MASSACHUSETTS

SUPERIOR COURT
DEPARTMENT
OF THE
TRIAL COURT
CIVIL ACTION

.................. MIDDLESEX .......... , ss
[seal]

No. ...............

Bradford Glen, Inc. ............ , Plaintiff(s)

v.

Sunrise Development, Inc. ; Defendant(s)

## SUMMONS

To the above-named Defendant:  Sunrise Development, Inc.

    You are hereby summoned and required to serve upon ..Denise.A..Brogna,.Esq.........................

................................................. plaintiff's attorney, whose address is ..........................................

..... 12 Chestnut Street, Andover, MA 01810 ...., an answer to the complaint which is herewith

served upon you, within 20 days after service of this summons upon you, exclusive of the day of service. If you

fail to do so, judgment by default will be taken against you for the relief demanded in the complaint. You are also

required to file your answer to the complaint in the office of the Clerk of this court at ...................................

...... Woburn ............................................................. either before service upon plaintiff's attorney or within a

reasonable time thereafter.

    Unless otherwise provided by Rule 13(a), your answer must state as a counterclaim any claim which you may

have against the plaintiff which arises out of the transaction or occurrence that is the subject matter of the plaintiff's

claim or you will thereafter be barred from making such claim in any other action.

    Witness, **Barbara J. Rouse**, Esquire, at ...................................................................................

the ..21st.............................................. day of .......... September ......................................

....................., in the year of our Lord ....two.thousand.ten......... .

*Edward J Sullivan*

Clerk

NOTICE TO DEFENDANT — You need not appear personally in court to answer the complaint, but if you claim to have a defense, either you or your attorney must serve a copy of your written answer within 20 days as specified herein and also file the original in the Clerk's Office.

NOTES.
1. This summons is issued pursuant to Rule 4 of the Massachusetts Rules of Civil Procedure.
2. When more than one defendant is involved, the names of all such defendants should appear in the caption. If a separate summons is used for each defendant, each should be addressed to the particular defendant.

FORM NO. SUP. — 001

# Commonwealth of Massachusetts
## County of Middlesex
### The Superior Court

CIVIL DOCKET # **MICV2010-03491-L2**

**Courtroom Civil L2 - CtRm 740- 200 TradeCenter, Woburn**

RE:  **Bradford Glen, Inc. v Sunrise Development, Inc.**
TO:

　　　　　Denise A Brogna, Esquire
　　　　　Johnson & Borenstein LLC
　　　　　12 Chestnut Street
　　　　　Andover, MA 01810

## SCHEDULING ORDER FOR  F  TRACK

You are hereby notified that this case is on the track referenced above as per Superior Court Standing Order 1-88. The order requires that the various stages of litigation described below must be completed not later than the deadlines indicated, and case shall be resolved and judgment shall issue 07/06/2012.

| STAGES OF LITIGATION | SERVED BY | FILED BY | HEARD BY |
|---|---|---|---|
| Service of process made and return filed with the Court | 12/14/2010 | 12/14/2010 | |
| Response to the complaint filed (also see MRCP 12) | | 01/13/2011 | |
| All motions under MRCP 12, 19, and 20 | 01/13/2011 | 02/12/2011 | 03/14/2011 |
| All motions under MRCP 15 | 01/13/2011 | 02/12/2011 | 03/14/2011 |
| All discovery requests and depositions served and non-expert depositions completed | 07/12/2011 | | |
| All motions under MRCP 56 | 08/11/2011 | 09/10/2011 | |
| Final pre-trial conference held and/or firm trial date set | | | 01/08/2012 |
| Case shall be resolved and judgment shall issue by **07/06/2012** | | | 07/06/2012 |

- The final pre-trial deadline is <u>not the scheduled date of the conference.</u>
- You will be notified of that date at a later time.
- Counsel for plaintiff must serve this tracking order on defendant before the deadline for filing return of service.

Dated: 09/16/2010

Michael A. Sullivan
Clerk of the Court

Telephone: 781-939-2754

COMMONWEALTH OF MASSACHUSETTS
Department of the Trial Court

MIDDLESEX, ss.                                      SUPERIOR COURT
                                                   Civil Action #_____

BRADFORD GLEN, Inc.
        Plaintiff

v.

SUNRISE DEVELOPJMENT, INC.
        Defendant

## COMPLAINT

### PARTIES

1.      Plaintiff, Bradford Glen, Inc. ("Bradford") is a Massachusetts domestic

corporation with its principle place of business at 1501 Main Street, Suite 11, Tewksbury,

Massachusetts.

2.      Defendant, Sunrise Development, Inc. ("Sunrise") is a foreign corporation

with its principle place of business located at 7900 Westpark Drive, Suite 8900, McLean,

Virginia  22102.

### FACTS

3.      On March 29, 2007, Bradford and Sunrise entered into an agreement for

the purchase and sale (the "Purchase and Sale Agreement") of approximately 48 acres of

land near Andover Road in Billerica, Massachusetts.  The original purchase price for the

land was $6,150,000, and the amount of $75,000 was to be deposited in escrow.  The

land was to be sold "as is" with no obligation on the part of the seller to obtain permits or

easements, or to modify any existing permits.  Under the terms of the Purchase and Sale

Agreement, Sunrise acknowledged the land was permitted for 164 elderly housing units.

A true and correct copy of the Purchase and Sale Agreement is attached hereto as **Exhibit A**.

4.      Prior to the execution of the Purchase and Sale Agreement, Sunrise was aware that Bradford had been negotiating with an abutting land owner for a sewer easement, and it acknowledged same in the Purchase and Sale Agreement.  Under the terms of the Purchase and Sale Agreement, Sunrise wanted the right to review the easement documents, but it agreed not to unreasonably withhold its consent to the easement documents.  Attached hereto as **Exhibit B** is a true and correct copy of the sewer easement documents.  The draft form of the agreement with the adjacent land owner was faxed to Sunrise's attorney on March 27, 2007 (prior to execution).

5.      On March 27, 2007, Sunrise acknowledged receipt of the sewer easement agreement, promised to review title, permits, and the sewer easement during the due diligence period, and enter into an amendment to the sewer agreement to split work and payment between Bradford and Sunrise, if necessary.  Sunrise acknowledged that the Purchase and Sale Agreement obligated Sunrise to be reasonable in approving the sewer easement agreement.

6.      However, Sunrise did not approve or disapprove of the sewer easement agreement, and did not diligently pursue the permits.  Instead, Sunrise sat on the sewer easement agreement for over a year before commenting.

7.      On April 9, 2007, Sunrise executed the Escrow Agreement as part of the Purchase and Sale Agreement and deposited the $75,000 pursuant to the terms of the Purchase and Sale Agreement and Escrow Agreement.  As true and correct copy of the executed Escrow Agreement is attached hereto as **Exhibit C**.

2

8.     On May 18, 2007, Bradford and Sunrise agreed to extend the time for completion of the feasible study as defined in the Purchase and Sale Agreement from May 18, 2007 to and including May 25, 2007.  Sunrise requested the extension, and Sunrise was to complete the study.  A true and correct copy of the parties' May 18, 2007 letter agreement is attached hereto as **Exhibit D**.

9.     On September 24, 2007, Bradford and Sunrise entered into the First Amendment to Purchase and Sale Agreement ("First Amendment").  The First Amendment provided Sunrise with an opportunity to pursue approvals for Sunrise's proposed development of a senior living community having at least 164 units of independent and assisted living and related facilities and required a pre-payment deposit be paid from Sunrise to Bradford in the amount of $3,800,000 secured by a mortgage from Bradford to Sunrise against the land.  Such pre-payment deposit was to be used for the purposes of paying off all existing mortgages on the land.  In addition, the amount of the deposit was increased by $100,000, so a total of $175,000 was being held by the Escrow Agent.  A true and correct copy of the First Amendment to the Purchase and Sale Agreement is attached hereto as **Exhibit E**.

10.     Under Paragraph 2(a) and (b) of the First Amendment, Sunrise acknowledged that it has had an opportunity to fully inspect the condition of property, including availability and capacity of water, sewer and other utilities, and was satisfied with the condition.  Sunrise further acknowledged that it was satisfied with title, except for objections listed in May 7, 2007 letter which Bradford agreed to resolve.

11.     Paragraph 4 of the First Amendment provided that the sewer easement shall only be required if Sunrise determined the easement was necessary and notified

3

Bradford that such easement was required within 90 days prior to closing. Sunrise failed to timely notify Bradford regarding Sunrise's need for the easement.

     12.    In March 2008, Bradford and Sunrise executed a Second Amendment to the Purchase and Sale Agreement, which set closing date for April 28, 2008. Even though not previously a condition to the Purchase and Sale Agreement, Bradford agreed to obtain a non-exclusive sewer easement subject to Sunrise's consent, which was not to be unreasonably withheld. This Second Amendment also provided for a reduction in the purchase price of the property to $5,626,000, and authorized the release of $87,500 from the deposit being held in escrow. A true copy of the Second Amendment to the Purchase and Sale Agreement is attached hereto as **Exhibit F.**

     13.    In March 2008, Sunrise's attorney contacted Seller's attorney to begin drafting documents for the closing.

     14.    In March and April 2008, Sunrise submitted a warrant article for Town Meeting approval of an increase in the number of units from 164 "elderly housing" to 250 mixed "assisted living" units. Nothing in the Purchase and Sale Agreement, nor within any amendment, provided that an increase in the number of units was a condition of completing purchase.

     15.    On April 23, 2008, the parties entered into a letter amendment extending the closing date to the date which is the later of (i) ten days after recording of an agreement for the sewer easement or (ii) June 9, 2008.

     16.    In May 2008, Sunrise failed to obtain Town Meeting approval to increase the number of units in the project from 164 to 250.

4

17.     In August 2008, Sunrise finally responded that Sunrise would not approve the sewer easement until it was in final form. Sunrise indicated that although Sunrise was satisfied with title with regard to the sewer easement, it would not provide written confirmation of the satisfaction of title or the title company's review until the easement was in final form. Further, Sunrise indicated that engineering relating to the easement had not been completed, so Sunrise could not approve the easement. Bradford could not finalize and execute the Easement Agreement until Sunrise approved the language of the agreement as required by the terms of the Purchase and Sale Agreement. Further, Sunrise drafted the Easement Agreement. When explained to Sunrise, that Sunrise's inconsistency and positions with regard to the easement and its lack of diligence were harmful to Bradford and the transaction, Sunrise refused to change its position. Further, Sunrise's engineers had previously represented to Bradford that all engineering work associated with the easement was acceptable and understood. Therefore, Sunrise's late statements that the engineering was not complete and was unacceptable did not make any sense.

18.     Sunrise expected Bradford to enter into a sewer easement agreement and obligate itself to pay for a sewer easement agreement which Sunrise was unwilling to approve. Sunrise's position was unreasonable. Its action in connection with the easement were made in bad faith, done with the intention of trying to circumvent Sunrise's obligations under the Purchase and Sale Agreement, and to further delay the closing so it could tie up the land even longer.

19.     Bradford informed Sunrise that it failed to pursue necessary permits in a timely fashion. Bradford requested that Sunrise confirm Sunrise compliance with the

Purchase and Sale Agreement and prove Sunrise's efforts to diligently pursue all approvals of all necessary permits to develop and construct the senior living community having at least 164 units. Sunrise was required to provide copies of all applications submitted by Sunrise for permits and approvals. However, Sunrise failed to provide copies of all applications to Bradford in a timely fashion. Therefore, it appeared that Sunrise was taking no actions to obtain approvals and permits necessary to develop and construct the project under the due diligence provisions of the Purchase and Sale Agreement.

20.    The activities of Sunrise with regard to its lack of due diligence with the permits, further injured Bradford in regard to the order of conditions. As a result of Sunrise's repeated delays, Bradford was forced to apply for an extension for its order of conditions. In connection with that extension, Bradford was forced to agree to certain additional conditions, which were consistent with Sunrise's proposed plans, and which were approved by Sunrise. Unfortunately, these additional conditions reduced the number of units Bradford would have been able to build if Sunrise failed to purchase the property. Nevertheless, Bradford agreed to these additional conditions as an extension of its order of conditions based on representations of Sunrise that Sunrise would go forward with the purchase.

21.    In order to keep the property taxes up, Bradford was also forced to pay property taxes for the period which Sunrise refused to go forward with the transaction. As a result, Bradford paid property taxes for fiscal year July 31, 2008, October 10, 2008 and November 25, 2008. As a result, Bradford paid $43,530.09 in property taxes which

6

Sunrise should have paid had Sunrise closed on the property as Sunrise had previously promised.

22.    On November 4, 2008, Sunrise terminated the agreement to purchase the land from Bradford. Attached hereto as **Exhibit G** is a true and correct copy of the November 4, 2008 letter of termination from Sunrise.

23.    On November 25, 2008, Bradford responded to Sunrise's termination letter with a demand for release of Deposit in accordance with the terms of the Purchase and Sale Agreement, and demanded for payment of the outstanding real estate taxes, which Sunrise had been required to pay under Paragraph 3 of the First Amendment. In addition, Bradford demanded that Sunrise provide Bradford with an outline/chronology of all actions taken by Sunrise to pursue necessary permits so Bradford could confirm compliance with Section 2(d) of the Amendment.

24.    Sunrise failed to pay outstanding taxes or deliver the outline or documentation to Bradford.

25.    In March 2009, Bradford sent a letter to Sunrise outlining Bradford's potential claims for damages due to Sunrise's failure to honor the terms of the Purchase and Sale Agreement and breach of the covenant of good faith and fair dealing. A true and correct copy of the March 30, 3009 letter is attached hereto as **Exhibit H**.

## Count I

### (Declaratory Relief)

26.    Bradford restates and incorporates paragraphs 1-25 of this Complaint as if fully stated herein.

7

27.     An actual controversy has arisen over each party's rights as articulated in the Purchase and Sale Agreement, First Amendment and Second Amendment.

28.     Bradford seeks a declaration of its rights against Sunrise under Purchase and Sale Agreement, First Amendment and Second Amendment.

## Count II

### (Breach of the Covenant of Good Faith and Fair Dealing)

29.     Bradford restates and incorporates paragraphs 1-28 of this Complaint as if fully stated herein.

30.     Inherent and implied in all contracts is the implied covenant of good faith and fair dealing, and this implied covenant applies to the parties, the Purchase and Sale Agreement, the First Amendment and the Second Amendment to the Purchase and Sale Agreement in this case.

31.     Bradford entered into the Purchase and Sale Agreement, the First Amendment and the Second Amendment in good faith with the intent to honor all its obligations under these agreements in a timely and forthright manner.

32.     As further indication of Bradford's good faith, Bradford timely provided Sunrise with the easement documents, and timely responded to Sunrise's requests for extension of time to complete the feasibility study, and to Sunrise's request for the amendments to the Purchase and Sale Agreement.

33.     On information and belief, Bradford alleges that Sunrise did not enter into the Purchase and Sale Agreement or amendments in good faith, but rather to bind the property and take it off the market so that Sunrise would not have to worry about competitors.

8

34.     As a further indication of Sunrise's breach of the covenant of good faith, Sunrise requested the right to review the easement documents in 2007, obtained a copy of those documents in 2007, but sat on those documents for over a year before making unreasonable demands upon the abutter granting the easement. Sunrise's demands were so outrageous that Sunrise damaged the relationship between Bradford and the abutter such that Sunrise's actions jeopardized Bradford's negotiations in obtaining a sewer easement from the abutter.

35.     As a further indication of Sunrise's breach of the implied covenant of good faith and fair dealing, Sunrise made misrepresentations to Bradford about Sunrise's intent to complete the transaction.

36.     As a result of Sunrise's actions, Bradford's initial permits were jeopardized or compromised and Bradford has incurred damages as a direct result of Sunrise's conduct in violation of Chapter 93A and in an amount to be proven at trial.

### Count III

### (Violation of Chapter 93A)

37.     Bradford restates and incorporates paragraphs 1-36 of this Complaint as if fully stated herein.

38.     During negotiations of the Purchase and Sale Agreement and the First and Second Amendments, Bradford was concerned about extending the closing date to allow Sunrise to apply for new permits and approvals because Bradford was selling the property "as is" with all permits in place.

9

39. Bradford realized that if the property had not sold within the time period set forth in the Agreement, or if Sunrise took actions to change the scope of the project, then existing permits for the project would be jeopardized.

40. Sunrise made representations to Bradford that Sunrise intended to go forward with the transaction with the intent that Bradford rely on Sunrise' representations to Bradford's detriment.

41. Sunrise made these misrepresentations to Bradford in an effort to compromise Bradford's financial interests in the property and obtain an unfair financial advantage. For example, Sunrise repeatedly misrepresented its intent to go forward with the transaction in order to get Bradford to extend the time for Sunrise to comply with the Purchase and Sale Agreement, to execute the First and Second Amendments to the Purchase and Sale Agreement to get Bradford to commit to obtain the sewer easement.

42. At the time Sunrise made the statements, Bradford did not know that Sunrise's statements were false and that Sunrise had no intent to honor the agreements.

43. Bradford relied on representations made by Sunrise to its detriment. In February 2008, Bradford applied for an extension of its existing order of conditions. In connection with extending the order of conditions, Bradford agreed to certain conditions which were consistent with Sunrise's proposed plan but which reduced the number of units Bradford would be able to build.

44. Bradford acted in good faith and reasonably relied upon the misrepresentations by Sunrise. In fact, Bradford fully intended to go forward with the closing.

10

45.     Sunrise then interfered with Bradford's attempts to get the sewer easement.

46.     When it was time to close, Sunrise intentionally withheld its approval of the easement to again extend the date and prevent Bradford from closing.

47.     Sunrise breached the Purchase and Sale Agreement at Section 2(b) when it failed to use good faith to diligently pursue all of the approvals and permits necessary to develop, construct and operate the senior living community.

48.     Then, Sunrise inexplicably terminated the agreements.

49.     Bradford demanded reimbursement for property taxes, release of escrow funds, permit outline and documentation as provided for in the agreements.

50.     Sunrise refused to pay said taxes, release escrow funds or provide permit documentation as provided for in the agreements.

51.     As a result of Sunrise's actions, Bradford's initial permits were jeopardized or compromised and Bradford has incurred damages as a direct result of Sunrise's conduct in violation of Chapter 93A and in an amount to be proven at trial.

## Count IV

### (Failure to Act Diligently to Pursue Permit/Breach of Contract)

52.     Bradford restates and incorporates paragraphs 1-51 of this Complaint as if fully stated herein.

53.     During negotiations of the Purchase and Sale Agreement and the First and Second Amendments, Bradford was concerned about extending the closing date to allow Sunrise to apply for new permits and approvals because Bradford was selling the property "as is" with all permits in place.

54.    Bradford realized that if the property had not sold within the time period set forth in the Agreement, or if Sunrise took actions to change the scope of the project, then existing permits for the project would be jeopardized.

55.    As the direct result, Bradford requested that Sunrise comply with the initial deadlines set in the initial Purchase and Sale Agreement and subsequent amendments.

56.    Bradford negotiated Section 2(d) to prevent Sunrise from tying up the property and doing nothing to pursue permits.

57.    However, Sunrise did exactly that, tied up the property but failed to diligently pursue any permits.

58.    Sunrise breached the Purchase and Sale Agreement at Section 2(b) when it failed to use good faith to diligently pursue all of the approvals and permits necessary to develop, construct and operate the senior living community.

59.    Sunrise still did not comply with any deadlines articulated in the initial Purchase and Sale Agreement and subsequent amendments.

60.    Sunrise realized that its failure to diligently pursue the permit modification and close on the property would jeopardize Bradford's existing permits.

61.    As a result of Sunrise's actions, Bradford's initial permits were jeopardized or compromised and Bradford has incurred damages as a direct result of Sunrise's conduct in violation of Chapter 93A and in an amount to be proven at trial.

### Prayer for Relief

WHEREFORE, Bradford prays for the following:

1.    for a judgment in its favor and against defendant Sunrise;

2.  for damages according to proof;

3.  for costs and attorneys' fees as provided by law; and

4.  for such other and further relief as the Court deems just and appropriate.

Respectfully submitted,
Plaintiff, Bradford Glen, Inc.
By its attorney,

Denise A. Brogna, Esq., BBO #662920
JOHNSON & BORENSTEIN, LLC
12 Chestnut Street
Andover, MA 01810
(978)475-4488

September 17, 2010

13

# EXHIBIT A

## PURCHASE AND SALE AGREEMENT

THIS PURCHASE AND SALE AGREEMENT ("Agreement") is made and entered into this 24ᵗʰ day of March, 2007, by and between **Bradford Glen, Inc.,** a Massachusetts corporation ("Seller"), and **Sunrise Development, Inc.,** a Virginia corporation, its successors and assigns ("Purchaser").

WHEREAS, Seller is the owner of a certain properties located on and near Andover Road, Billerica, Massachusetts as described on Exhibit A attached hereto (the "Real Property"); and

WHEREAS, Seller desires to sell and Purchaser desires to purchase the Real Property, pursuant to the terms, provisions and conditions herein; and

WHEREAS, Seller is willing to grant a Feasibility Study Period, as defined in Paragraph 5 herein, to allow the Purchaser to study the development potential of the Real Property.

NOW, THEREFORE, in consideration of Ten Dollars ($10.00), cash in hand paid, the receipt and sufficiency of which are hereby acknowledged, the premises, the mutual covenants and conditions set forth herein and other good and valuable consideration, and intending to be legally bound hereby, the parties hereby agree as follows:

1.   PURCHASE AND SALE OF PROPERTY.

1.1   Seller agrees to sell and Purchaser agrees to purchase the Real Property and all rights appurtenant thereto existing as of the date hereof; all improvements on and to the Real Property; all mineral, oil, and gas rights and profits, water rights and subterrain rights; all sewer and utility rights appurtenant to the Real Property and the improvements; all right, title, and interest of Seller in and to any roads, streets and ways, public or private, serving the Real Property; and appurtenances to the Real Property; all right, title and interest of Seller in and to any land lying in the bed of any street, road, avenue, lane or right-of-way in front of, adjoining or adjacent to the Real Property; all rights and entitlements to development of the Real Property granted by governmental or quasi-governmental bodies or entities having jurisdiction or authority over the Real Property, (all of the foregoing, together with the Real Property, being referred to herein as the "Property").

Notwithstanding the foregoing, the Purchaser understands that as part of the efforts of the predecessor in title to Seller to obtain from the Town of Billerica a Special Permit Decision to permit the construction of 164 "elderly housing" units (plus a club house) (the "Project")on the Real Property (the "Special Permit Decision") such predecessors agreed to place against a portion of the Real Property certain restrictive covenants, all as set forth in that certain Restrictive Covenant Agreement signed by Donald F. MacDonald, Phyllis A. MacDonald, Romolo E. Capobianco, Fay Capobianco and M.E.G. Trust dated May 22, 1997, a true and complete copy of which is attached hereto as Exhibit B (the "Restrictive Covenant Agreement"). The parties acknowledge that the executed original of the Restrictive Covenant Agreement was

delivered to Town Counsel on May 22, 1997 to be held in escrow pending approval of a certain warrant article and the issuance the Special Permit allowing the construction of the Project. The Restrictive Covenant Agreement has not been placed of record as of the date of this Agreement. Because the individuals who executed and delivered the original Restrictive Covenant Agreement are not longer the owners of the Property, a new Restrictive Covenant Agreement needs to be executed by the current owner of the Property and delivered to the Town Counsel to replace the original Restrictive Covenant Agreement. In the event that the Seller does not record the Restrictive Covenant Agreement prior to Closing, Purchaser agrees that the conveyance contemplated by this Agreement shall, nevertheless, be subject to the Restrictive Covenant Agreement if Purchaser proceeds with the development of the Property in accordance with the Special Permit Decision, and that Purchaser shall be responsible for providing a replacement Restrictive Covenant Agreement to Town Counsel, in the same form as the original Restrictive Covenant Agreement and recording same. At the request of Purchaser, Seller shall not take any action to deliver a replacement Restrictive Covenant Agreement prior to the Closing, unless so required by the Town.

   1.3 Purchaser further acknowledges as part of the efforts of Seller's predecessor in title to obtain the Special Permit Decision, Romolo E. Capobianco executed a Quitclaim Deed dated May 22, 1997 to The Inhabitants of the Town of Billerica, a true and correct copy of which is attached hereto as Exhibit C (the "Quitclaim for Deed"), conveying to such the Town of Billerica a portion of the Real Property more fully described therein. The Quitclaim Deed was delivered to Town Counsel on May 22, 1997 to be held in escrow pending approval of a certain warrant article and the issuance the Special Permit allowing the construction of the Project. The Quitclaim Deed has not been recorded as of the date of this Agreement. Like the Restrictive Covenant Agreement, the original Quitclaim Deed was executed by a person who no longer owns the Property. As a result, a new Quitclaim Deed needs to be executed by the current owner of the Property and delivered to the Town counsel to replace the original Quitclaim Deed. In addition, the legal description provided in the original Quitclaim Deed does not reference a plan of record. To correct this issue, an engineer has arranged for its engineer to prepare a recordable plan which shows the property to be conveyed by the Quitclaim Deed. A copy of the plan will be provided to Purchaser as part of the Seller's Documents. In the event the Quitclaim Deed is not recorded prior to the Closing and Purchaser proceeds with the development of the Property in accordance with the Special Permit Decision, Purchaser shall be responsible for providing a replacement Quitclaim, in the same form as the original Quitclaim Deed (including reference to recorded plan) and recording same together with the plan to be referenced therein. Seller agrees that for the purposes of the reversionary interest contained in the Quitclaim Deed, following Closing, Purchaser shall be deemed to be the "Grantor" under the Quitclaim Deed and Seller hereby releases any rights to reversion in said deed. This Section 1.3 shall survive the Closing and the recording of the deed. At the request of Purchaser, Seller shall not take any action to deliver a replacement of the Quitclaim Deed prior to the Closing, unless so required by the Town.

## 2. PURCHASE PRICE AND DEPOSIT.

   2.1 The purchase price for the Property shall be SIX MILLION ONE HUNDRED FIFTY THOUSAND DOLLARS ($6,150,000) (the "Purchase Price"), subject to

adjustments as hereinafter provided.

      2.2    Purchaser shall deposit with the National Office of First American Title Insurance Company, as Escrow Agent, a deposit in the amount of SEVENTY-FIVE THOUSAND DOLLARS ($75,000) within five (5) days of execution of this Agreement. Purchaser and Seller shall execute the Escrow Agreement attached hereto as Exhibit D. Upon receipt of a fully signed Escrow Agreement, Escrow Agent will deposit said funds in an interest-bearing account at a federally-insured commercial bank, with the interest to accrue to Purchaser, subject to the default provision contained in this Agreement. The $75,000 deposit and any additional deposits, together with any interest earned thereon, may be referred to herein as the "Deposit".

      2.3    At Closing, the Deposit shall be applied to the Purchase Price.

3.    **TITLE.**

      3.1    Title to the Property shall be conveyed to Purchaser at Closing in fee simple by a Quitclaim Deed, with quitclaim covenants, free and clear of any and all liens, claims, encumbrances, mortgages, deeds of trust, and security interests but subject to all Permitted Exceptions.

      3.2    Purchaser shall obtain, within 30 days of the Effective Date of this Agreement, a Commitment for Title Insurance (the "Title Commitment") from First American Title Insurance Company (the "Title Company"), committing to insure upon the payment of a requisite premium at standard rates that Purchaser shall own good and indefeasible fee simple title to the Property, subject only to the Permitted Exceptions, as defined herein. Purchaser, upon receipt of the Title Commitment, shall promptly forward a complete copy of the Title Commitment to Seller. Purchaser shall have until 40 days after the Effective Date of this Agreement within which to object, by written notice to Seller, to any exceptions to title set forth in the Title Commitment. Such objections shall be within Purchaser's sole discretion. If Purchaser fails to object to any such item by written notice to Seller prior to the expiration of said 40 days, Purchaser shall be deemed to have approved such item. If Purchaser objects to any such item by timely written notice to Seller, Seller shall have the right (without any obligation to do so) to elect to cure or attempt to cure Purchaser's objections to such item by providing written notice Purchaser within 5 days after receiving such notice. In the event Seller is unable to or elects not to cure any one or more of Purchaser's non-monetary objections, Seller may notify Purchaser in writing of such election and request that Purchaser waive Purchaser's right to terminate this Agreement due to such objections(s). If Purchaser does not terminate this Agreement within 5 days of receiving such notice from Seller, Purchaser shall be deemed to have waived its right to terminate this Agreement due to such objections. If Seller fails to respond to Purchaser's objections within 5 days after receiving notice of such objections from Purchaser, Seller shall be deemed to elect not to cure such objections. If, not having received any notice from Seller within Seller's 5-day window of opportunity to choose to cure or attempt to cure Purchaser's objection, Purchaser does not terminate this Agreement within 10 days of sending such notice to the Seller, Purchaser shall be deemed to have waived its right to terminate this Agreement due to such objections.

3.3     The term "Permitted Exceptions", as used herein, shall mean (i) the lien of real estate taxes not yet due and payable, (ii) all matters revealed in the Title Commitment obtained by Purchaser and approved by Purchaser as provided hereinabove, (iii) all existing building, zoning and other city, state, county or federal laws, codes and regulations affecting the Property, (iv) any existing general utility easements serving the Property and the easement described in Section 3.6 below, and (v) any title exception created directly by any act or omission of Purchaser or its representatives, agents, employees or invitees.  The foregoing Permitted Exceptions shall not limit Purchaser's right to terminate this Agreement as provided under Section 5.3.

3.4     If, at or before Closing, it appears that the Property may be or is subject to mechanics' or materialmen's liens or the lien of decedent's debts, Seller shall, at Seller's cost and expense, provide special insurance against such lien and upon so doing the same shall be considered good delivery of title with respect thereto under this Agreement.  Seller shall discharge, or put the amount necessary to discharge such lien in escrow subject to terms and conditions acceptable to Seller until such lien is discharged, all voluntary monetary liens, and all non-voluntary monetary liens totaling less than $200,000 at Closing, and if Seller fails to do so, Purchaser may do so for Seller's benefit and receive a credit in such amount against the Purchase Price.  In the event non-voluntary monetary liens totaling for more than $200,000 are placed against the Property, the Seller shall use reasonable efforts to remove said liens prior to Closing and, provided Seller provides notice to Purchaser of Seller's inability to remove said lien at least 2 days prior to Closing, the Closing Date shall be extended for a period of thirty (30) days to allow the Seller to remove such non-voluntary lien. If, at the end of said 30 day period the lien cannot be removed, then at Purchaser's option, Purchase may either terminate this Agreement and the Deposit with all interest earned thereon shall be returned to Purchaser, and neither party shall have recourse against the other in law or in equity or elect to proceed to Closing and take title subject to such lien.

3.5     If, at or before Closing, it appears that the Property is subject to the possible lien of unsettled corporate taxes or will be subject to possible corporate tax liability of Seller in the ownership of Purchaser, Seller will enter into an agreement satisfactory to the Title Company or deposit funds or security with the title insurer as required to induce the Title Company to insure title to the Property free and clear of loss or damage by reason of the nonpayment of such unsettled and other corporate taxes and the same shall be considered good delivery of title with respect thereto under this Agreement.

3.6     Seller is in the process of obtaining a 30 foot wide sewer easement running from Marriott Road to the Property from an adjacent land owner. Seller shall provide the most current draft of the Sewer and Water Easement, together with the plan showing such easement area, to Purchaser as part of Seller's Documents. Seller shall not execute or record such sewer easement prior to the Closing, without the prior written consent of Purchaser, which such consent shall not be unreasonably withheld.

4.   DOCUMENTS.

Seller shall provide the following documents related to the Property to the Purchaser: copies of all final reports relating to environmental investigations at the Property in Seller's possession or control as of the date hereof, copies of all final site plans approved by the Town of Billerica in connection with the Project; the existing title insurance policy, with copies of all exceptions listed therein for the Property; copies of all final approvals or permits granted by the Town of Billerica, the Massachusetts Department of Environmental Property and other state and local agencies in connection with the Property in Seller's possession or control as of the date of this Agreement, including, without limitation, the documents listed on Schedule 4 (the "Seller's Documents"). For the purposes hereof, "Seller's possession or control" shall mean in the possession or control of either Tom Patenaude or Barry Sullivan as of the date of this Agreement. Until Closing, the Seller's Documents delivered to Purchaser shall remain the property of Seller, and if Closing does not take place for any reason other than the breach of this Agreement by Seller, Purchaser shall promptly return all such materials to Seller together with all copies Purchaser or its agents have made. Such documents are provided to Purchaser without any representation or warranty other than Seller does not have actual knowledge of any statements or facts set forth in the Seller's Documents that are materially false or misleading. Seller shall, upon Purchaser's written request, deliver such other documents or instruments relating to the Property to the extent such requested documents are in the Seller's possession or control on the date of such request and do not involve proprietary information of Seller relating to the value of the Property, market studies or construction cost analysis.

5.   FEASIBILITY STUDY PERIOD.

5.1   From and after the Effective Date, Purchaser, its agents, contractors, engineers, surveyors, attorneys, employees and invitees shall have the right, at its sole cost and expense, upon reasonable advance written notice to Seller (which notice may be given verbally or by electronic mail), to enter the Property to make studies, tests, analyses, or other determinations desired by Purchaser, including soil borings, drainage studies, surveying, soil testing, environmental studies, hazardous materials inspections and the like. Notwithstanding the foregoing, Purchaser shall not conduct any intrusive testing on the land shown as Lot 2 on Plan of Land entitled: "Subdivision Plan of Land, Andover Road, Billerica, Massachusetts, Scale:  1"=60', January 5, 2007; Prepared for: Bradford Glen, Inc., P.O. Box 280, Tewksbury, MA  01876; Prepared By: Dresser, Williams & Way, Inc., 36 Webb Brook Rd., Billerica, MA" recorded with Middlesex North Registry of Deeds in Plan Book 223, Plan No.72, which land is to remain in its natural condition, it being understood that Purchaser may elect to undertake soil borings, soil testing samples and like tests within such area provided that no heavy equipment (backhoes, trucks) are used and no plant life or other natural features of the Property are damaged or destroyed. If Purchaser determines that intrusive testing is required to complete its evaluation of the Property during the Feasibility Period, then it shall submit a scope of work describing the proposed intrusive testing for Seller's review and approval. Within 5 days of Seller's receipt of said scope of work, Seller shall notify Purchaser of its approval or disapproval of such testing. Purchaser agrees to defend, indemnify and hold Seller harmless for any and all claims, lawsuits, liabilities (including, without limitation, natural resource damage, property

5

damage, environmental contamination, personal injury or death) expenses, and costs that may arise out of, in connection with, or as a result of the Purchaser's exercise of those rights granted by this Section 5.1 to Purchaser. Purchaser shall reasonably restore the Property to its condition prior to the entry by the Purchaser in connection with the rights granted herein. Within 5 days of the effective date of this Agreement and prior to any entry on the Property, the Purchaser shall provide the Seller with an insurance binder naming the Seller as an additional insured, such insurance binder shall evidence that the Purchaser maintains commercial general liability insurance with limits of not less than $2,000,000 per occurrence for bodily injury an property damage.

5.2     Purchaser shall have the right throughout the Feasibility Study Period to investigate and confirm that zoning, including any current special exception, land use, and other applicable ordinances, regulations, proffers and other official actions, site conditions, water, sewer and other utility availability and capacity shall, in Purchaser's opinion, permit the construction of sufficient improvements for Purchaser's intended use.

5.3     Purchaser may elect, at its sole discretion, at any time prior to the date that is forty-five (45) days after the Effective Date of this Agreement (the "Feasibility Study Period") to terminate this Agreement for any reason (or for no reason whatsoever) and receive the prompt refund of the Deposit, together with any and all accrued interest. Purchaser shall be deemed to have elected to terminate this Agreement by providing written notice delivered to Seller prior to the expiration of the Feasibility Study Period notifying Seller that Purchaser is terminating this Agreement. For the purposes of this Section 5.3, Purchaser may provide notice to Seller by electronic mail sent to Seller at its counsel e-mail address: mark@jbllclaw.com.  In the absence of such notice, this Agreement shall remain in full force and effect.

5.4     The Purchaser shall deliver to Seller copies of all studies, tests, analyses, or other determinations obtained by Purchaser, including soil borings, drainage studies, surveying, soil testing, environmental studies, hazardous materials inspections and the like (but excluding all market and financial analyses, reports and studies and all other proprietary business information of Purchaser) within 7 days of receipt by the Purchaser. Such materials shall be made available to Seller without any representation or warranty by Purchaser. Neither Purchaser nor its consultants shall disclose the contents of any environmental report obtained by result of its evaluation of the Property that reveals the existence of an environmental condition that would impose any liability for clean up on the owner of the Real Property or in any way affect the use and development of the Real Property under any applicable law to any third party prior to the Closing, without Seller's consent, except for such portions of such reports which Purchaser is required to disclose under applicable laws or regulations or in connection with a court action to enforce any of Purchaser's rights hereunder.

5.5     Purchaser shall not apply for any permit or approval or seek a modification of any permit or approval or file any application for a permit or approval that would be binding on Seller or the Real Property prior to the Closing Date nor shall it cause a public hearing to be held on any proposal.

5.6     Purchaser's agreements pursuant to this Section 5 shall survive the Closing and any termination of this Agreement for a period of one (1) year.

6.     COVENANTS OF SELLER.

In addition to all other covenants of the Seller contained herein, Seller hereby covenants and agrees with Purchaser as follows:

6.1     Seller shall not, without the prior written approval of Purchaser, (a) make or permit to be made any material changes or alterations to any part of the Property, except to the extent to necessary to prevent an imminent hazard or damage to the natural resources of the ......... Property, or resulting from Purchaser's entry on the Property; (b) permit any voluntary liens, mortgages, deeds of trust, or other encumbrances not currently of record to be placed against, or to affect any part of the Property or title to the Property, other than mortgage liens in favor of an institutional lending institutions, that when taken together with any existing liens the aggregate debt so secured is not more than Five Million Dollars ($5,000,000), and which provide by their respective terms that the mortgage lien shall be released and satisfied at any time and without penalty upon the sale of the Property to Purchaser (each a "Permitted Mortgage Lien"). Seller shall not commit any default which continues beyond the applicable cure periods under any Permitted Mortgage Lien.

6.2     Seller shall promptly notify Purchaser of, and promptly deliver to the Purchaser, a true and complete copy of any notice, communication, correspondence, application, agreement, plan or other item that it, or any agent of Seller sends or provides or receives from the Town of Billerica or any other governmental authority after the execution date of this Agreement relating to the permitting of the Property or any notice of default issued to Seller by the holder of any Permitted Mortgage Lien received by Seller after the execution date of this Agreement. Seller shall not act in bad faith to cause any of Seller's representations or warranties set forth herein to become materially inaccurate or false.

6.3     Seller shall take all reasonable steps necessary to keep in full force and effect all permits and approvals listed on Schedule 4 and in connection therewith shall timely file all required requests for extensions. Any extension filed by Seller at least 30 days prior to the expiration date shall be considered timely for the purposes of this Section 6. Seller shall prior to the filing of any such items provide a copy to Purchaser for Purchaser's review and comment, and approval, which such approval shall not be unreasonably withheld, conditioned or delayed. If Purchaser does not approve or provide comments in writing to Purchaser on any such submittal within 5 days of Purchaser's receipt of same, than such submittal shall be deemed approved and Seller shall proceed with the filing of such document.

7.     REPRESENTATIONS AND WARRANTIES OF SELLER.

Seller hereby represents and warrants, to the best of its knowledge, as of the date of execution of this Agreement the following to Purchaser:

7.1   Except as may be set forth in Seller's Documents, all of the permits, consents and approvals listed on Schedule 4 remain in full force and effect and Seller has no knowledge of (i) any such approvals being amended, modified, rescinded, terminated or revoked, or (ii) any outstanding appeal or other challenge being taken with respect to any such permit, consent or approval.  Seller hereby acknowledges that the bonds required under the Board of Health Approval of the Bradford Glen Condominium Development Condition (which Seller will provide to Purchaser as part of Seller's documents) have not been posted with the Town yet. Purchaser hereby acknowledges that Seller shall not be required to post said bonds prior to the Closing.

7.2   Except as may be set forth in the Seller's Documents, no suit, action, arbitration, or legal, administrative, or other proceedings is pending and Seller has not received written notice of any suit, action or legal proceeding being  threatened against the Property or against the Seller with respect to the Property.  The parties acknowledge that the Seller purchased the Property from John A. Burdick, Jr., acting in his capacity as Chapter 7 Trustee in each of two bankruptcy cases, In Re: Romolo E. Capobianco, Inc., Case No. 05-60107-HJB and In Re: Romolo E. Capobianco, Case No. 05-60109-HJB and there are ongoing actions relating to such Bankruptcy of which neither the Property nor Seller is a party.

7.3   No bankruptcy, insolvency, rearrangement, or similar action or proceedings, whether voluntary or involuntary, is pending against Seller, nor, has Seller received written notice of such any action being threatened against Seller, or any partner of Seller, and Seller has no intention of filing or commencing any such action or proceeding.

7.4   Except as may be set forth in the Seller's Documents, Seller has not received written notice of any uncorrected violations of any laws, statutes, ordinances, rules or regulations, and copies of any such notices hereafter issued prior to Closing shall be delivered to Purchaser in accordance with Section 6.2 above.

7.5   Except as set forth in Section 1.2 and 1.3, Seller is the fee owner of the Property and Seller has not granted to any other party any interest, including by way of example only, a life estate, in the Property.

7.6   Seller has not entered into any existing or pending contracts of sale, leases, options to purchase or rights of first refusal (or the like) with respect to the Property other than as set forth in Sections 1.2 and 1.3 above.

7.7   The Property shall be delivered to Purchaser at the Closing, free and clear of all tenancies or rights of possession, and other than as provided in the immediately following sentence, the Property is currently free and clear of all tenancies or rights of possession. Seller hereby discloses that when Seller purchased the Property, certain personal property, including a storage trailer, wood splitter and firewood, were located on the portion of the Property shown as Lot 3 on the plan recorded in Plan Book 112, Plan 14.  Seller believes this property is owned by Romolo E. Capobianco.  A copy of the letter to Romolo E. Capobianco from the Trustee is listed on Schedule 4 and has been provided to the Purchaser.  Seller will use reasonable efforts to have this property removed prior to Closing.

8

7.8    Seller is not a foreign person, as that term is defined in Section 1445 of the Internal Revenue Code as amended by the Foreign Investment in Real Property Tax Act of 1980 ("FIRPTA"), and Seller shall provide Purchaser with an affidavit to that effect in compliance with FIRPTA at Closing.

7.9    Except as may be set forth in the Seller's Documents, Seller has not received written notice of any pending, contemplated special assessments, betterments, eminent domain or condemnation proceedings affecting or which may affect any portion of the Property.

7.10    Seller possesses all requisite power and authority to enter into and perform this Agreement and to carry out the transactions contemplated herein. The execution and delivery of this Agreement and the consummation of the transactions will not result in a breach of any of the terms or provisions of, or constitute a default under, or conflict with, any agreement, indenture, or other instrument to which Seller is a party or by which it or the Property is bound, any judgment, decree, order, or award of any court, governmental body or arbiter, or any law, rule or regulation applicable to Seller.

7.11    During Seller's ownership of the Property Seller, has not caused nor permitted any discharge, spillage, controlled loss, seepage or filtration (a "Spill") of oil, petroleum or chemical liquids or solids, liquid or gaseous products or any hazardous waste or hazardous substance, as those terms are used in the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended, the Massachusetts Hazardous Material Release Prevention and Response Act,  or in any other federal, state or local law, order or regulation governing hazardous substances, as such laws, orders or regulations may be amended from time to time (collectively, the "Hazardous Waste Laws") at, upon, under or within the Property or, to the best of Seller's knowledge, any contiguous real estate;

7.12    Seller has not caused or to its knowledge permitted to occur, and shall not permit to exist, any conditions on the Property which may cause a Spill at, upon, under or within the Property;

7.13    Seller will not knowingly permit any person or entity store, generate, use or discharge any hazardous substances or materials on the Property that could lead to the imposition of liability under the Hazardous Waste Laws on any such person or entity, or on Seller or Purchaser.

7.14    Except as provided in the Seller's Documents, to the best of Seller's knowledge, there are no underground storage tanks on the Property, and, to the best of Seller's knowledge, there were no underground storage tanks on the Property prior to Seller's ownership of the Property.

8. **CONDITIONS PRECEDENT TO SELLER'S AND PURCHASER'S OBLIGATIONS.**

8.1     In addition to all other conditions contained elsewhere herein, the obligations of Purchaser to purchase the Property are subject to the following subparagraphs:

(a)     A final examination of title to the Property at Closing shall evidence no title exceptions other than Permitted Exceptions and those approved or deemed approved by Purchaser pursuant to Paragraph 3.2 hereinabove;

(b)     From the date of this Agreement until the Closing, there shall have not occurred any material change in the physical condition of the Property to which Purchaser has not consented, excluding any such changes necessary to prevent an imminent hazard or damage to the natural resources of the Property, or resulting from Purchaser's entry on the Property;

(c)     No governmental agency shall have initiated or have threatened to initiate any action against any part of the Property which would prevent the development of the Property in accordance with the Special Permit, except as the Seller shall have disclosed; and

(d)     Any moratorium or other similar action by an appropriate governmental entity preventing applications for or issuance of approvals, building permits, utility hook-ups or the like, shall have expired or otherwise been lifted, repealed or terminated.

8.2     If, between the expiration of the Feasibility Study Period and the date of Closing, there is evidence that a Spill of a Hazardous Waste or Hazardous Substance occurred on the Property after the expiration of the Feasibility Study, Purchaser may terminate this Agreement and receive back the Deposit, together with any and all accrued interest, without any further liability to Seller, with the sole exception of the indemnification and restoration requirements under Paragraph 5.1, which shall survive termination of this Agreement as set forth therein.

8.3     Any of the conditions to the obligations of Purchaser set forth herein may be waived; provided that the waiver of any conditions shall be in writing and agreed to by Purchaser.

8.4     In the event that any of the conditions precedent to Purchaser's obligations set forth above in this Paragraph 8 are not satisfied on the date of the Closing, Purchaser shall have the right, in its sole discretion, to terminate this Agreement by written notice to Seller, (subject to the notice requirements of Section 11.3) and receive a return of the Deposit, together with all accrued interest thereon.

8.5     The continued accuracy in all material respects of Seller's representations and warranties set forth herein shall be a condition precedent to Purchaser's obligation to close hereunder. If any representation or warranty of Seller set forth herein shall not be correct in any material respect at or before Closing Purchaser may, as its sole remedy on account thereof,

terminate this Agreement and receive a return of its Deposit, in which event the parties shall have no further liability hereunder (except as may be expressly provided herein survive termination, including, without limitation, the indemnification and restoration requirements under Paragraph 5.1).

9.   CLOSING.

9.1   The consummation of the contemplated transactions (the "Closing") shall be held at a location in greater Boston Massachusetts area, as selected by Purchaser, on the date which is thirty (30) days following the expiration of the Feasibility Study Period, or such earlier date as may selected by Purchaser in its sole discretion, time being of the essence. The exact date and time of the Closing shall be designated by Purchaser upon notice to Seller of not less than ten (10) days. The Title Company selected by Purchaser shall be responsible at the Closing for preparing the settlement statement, causing all documents to be recorded, disbursing all closing proceeds, and otherwise conducting settlement. At Purchaser's election, Closing shall occur through an escrow with the Title Company. In such an event the Closing shall occur at the offices of the Title Company at a time selected by Purchaser. All documents and instruments required for the Closing shall be delivered to the Title Company, at such location(s) as the Title Company shall direct, at least one (1) day prior to the Closing Date. Funds required for Closing shall be delivered and/or wired to the Title Company, at such location(s) as the Title Company shall direct, by 12:00 p.m. on the Closing Date. Each party agrees to execute and deliver to the Title Company closing escrow instructions to implement and coordinate the Closing as set forth in this Agreement.

9.2   At the Closing, Seller shall deliver to Purchaser, in a form and substance reasonably satisfactory to Purchaser's counsel, the following:

(a)   A recordable Quitclaim Deed, with covenants, conveying the Property in fee simple to Purchaser, or its assigns as provided in Paragraph 3. If requested by Purchaser, the deed shall include a legal description conforming to any survey of the Property obtained by Purchaser;

(b)   A certificate as to resolutions of the Seller authorizing the sale of the Property to Purchaser, certified by Seller's secretary or clerk;

(c)   Any and all other documents, instruments, and agreements necessary or appropriate in the reasonable opinion of Purchaser's attorney to transfer and convey the Property and all interest therein to Purchaser in accordance with this Agreement or as may be required by the title insurer, provided that such documents do not expand the liability or obligations of the Seller or are contrary to the terms of this Agreement. Such other documents, instruments and agreements shall be furnished to Seller's attorney at least five (5) days prior to Closing, provided Purchaser has requested them in writing at least 2 days prior to closing.

9.3     At the Closing, Purchaser shall deliver to Seller the balance of the Purchase Price in certified funds or by wire transfer pursuant to wire instructions provided by Seller after application of the Deposit previously tendered.

9.4     Seller shall pay the cost of Seller's attorneys' fees. Purchaser shall pay the cost of preparing and recording the Deed, all costs of the title company selected by the Purchaser set forth herein to insure title, and the cost of owner's title insurance policy. Real estate taxes and utilities shall be prorated between the parties as of the Closing on the basis of the fiscal year for which they are assessed. Seller shall each pay all state, local and county realty transfer taxes due in connection with the transfer of the Property. Seller shall be responsible for all roll-back taxes or agricultural transfer taxes and any other form of taxes or county assessments which become due as a result of the transfer of title to Purchaser.

9.5     Exclusive possession of the Property shall be delivered to Purchaser immediately upon completion of the Closing.

9.6     If at the time of Closing, the Property, or any part thereof, shall be or have been affected by a special governmental assessment or assessments which are or may become payable in annual installments of which the first installment is then due or has been paid, then for the purpose of this Agreement, all of the unpaid installments of any such assessment, including those which are to become due and payable after the delivery of the Deed shall be deemed due and payable and to be liens upon the Property affected thereby and shall be paid and discharged by Seller on or before the Closing. Unconfirmed improvements or assessments, if any, shall be paid and allowed by Seller on account of the Purchase Price if the improvement or work has been commenced on or before the date hereof. Seller represents and warrants that there are no unconfirmed improvements or assessments for improvements contemplated for the Property.

9.7     Purchaser acknowledges that it will cause the Property to be fully investigated and examined and it is accepting the Property AS-IS, WHERE-IS and WITH ALL FAULTS as of the date of this Agreement and as of the Closing without any guarantee, representation or warranty, except for those representations and warranties specifically set forth in herein which shall not survive the Closing. Notwithstanding the foregoing, Seller agrees that the representation set forth in Paragraph 7.1 shall survive the Closing until December 1, 2007.

10.     RISK OF LOSS CONDITION.

10.1    Prior to Closing, Seller shall bear all risk of loss to the Property and all liabilities arising from the Property except as otherwise set forth in Paragraph 5.1 hereinabove. In the event any site on the Property is damaged by a fire or other casualty, Seller shall cause the Property to be placed in a safe and secure condition free of all debris.

10.2    In the event of a condemnation, Purchaser shall have the option to terminate this Agreement and receive a return of the Deposit, including accrued interest thereon, or to proceed to Closing with any condemnation award paid or credited to Purchaser at Closing. Seller shall provide any notices that it receives with respect to any condemnation promptly to Purchaser. Purchaser shall have the right to participate in any and all condemnation actions and

value actions brought against the Property. Seller shall not settle or compromise any condemnation or action for value without Purchaser's prior written consent.

11.   REMEDIES.

11.1   In the event Seller willfully or intentionally breaches or fails to perform any of its covenants to be performed under this Agreement (but not including the breach of any representation or warranty set forth herein, which is addressed in Section 8.5 above), Purchaser shall be entitled (a) to enforce specific performance of this Agreement and bring suit for damages in amount not to exceed $100,000 to recover all actual and reasonable costs of suit and fees of attorneys and other consultants incurred in connection with such action; or (b) if specific performance in not available because the Seller has sold the Property to a third party, to bring suit for all damages suffered by reason of such failure of up to $250,000, and to recover all actual and reasonable costs expended by Purchaser for the survey and title commitment, if any, attorneys' fees, engineering and architectural fees, inspection costs, and such other actual and reasonable out-of-pocket expenses as Purchaser may have incurred in furtherance of its purchase of the Property under this Agreement, as liquidated damages; and (c) to have the Deposit, together with any and all accrued interest, returned to Purchaser.  In the event Seller breaches or fails to perform any of its covenants to be performed under this Agreement (but not including the breach of any representation or warranty set forth herein, which is addressed in Section 8.5 above) and such breach was not a result of its willful or intentional misconduct, then Purchaser's sole remedy shall be to terminate this Agreement and receive back the Deposit. The parties acknowledge that the damage amounts set forth above represent reasonable efforts to ascertain the damages to Purchaser in the event of a Seller default, which damages are difficult or impossible to quantify.

11.2   If Purchaser defaults in its performance of any term, covenant, condition, or obligation under this Agreement, including the obligation of Purchaser to purchase the Property if all conditions precedent to such obligations have been satisfied, Seller shall be entitled to receive as complete liquidated damages (a) the Deposit plus all interest earned thereon, as liquidated damages, and (b) copies of any and all engineering studies, site plans, and similar material owned by Purchaser and prepared by Purchaser or its agents or employees in connection with the contemplated development of the Property, which delivery shall be made without any representation or warranty whatsoever and shall be subject to the copyright, trademark and proprietary rights of others but shall have been fully paid for by the Purchaser. The parties acknowledge that the Deposit represents a reasonable effort to ascertain the damages to Seller in the event of a Purchaser default, which damages are difficult or impossible to quantify. Seller waives all other remedies. Notwithstanding the forgoing, there shall be no limitation on the damage the Seller may recover from the Purchaser as a result of the Purchasers breach of its obligations pursuant to Section 5.1 or the indemnification contained therein. The foregoing remedies shall be the Seller's sole remedy in law or in equity for a breach by the Purchaser.

11.3   A failure by either party to perform any act required by it under this Agreement, other than the requirement to close if all conditions have been met, shall not be deemed a default under this Agreement until such party has received written notice from the

other party setting forth the alleged failure, and such failure has not been cured within ten (10) days of receipt of such notice.

11.4    If any action is brought by either party hereto against the other party, the party in whose favor a final judgment shall be entered shall be entitled to recover court costs and reasonable attorneys' fees incurred in connection therewith.

## 12.    BROKERAGE COMMISSION.

The parties represent and warrant to each other that to the extent either has dealt with or engaged any other broker, finder or other person in connection with the transaction contemplated herein, that such party solely is obligated for any and all commissions claimed by such person, and that such party agrees to indemnify and hold the other harmless and defend on account of any loss, damage, liability or expense, including reasonable attorneys' fees, incurred by reason of a demand for payment by such broker, finder or other person. In the event that any broker files a lien against the Property pursuant to the any act, statute or law, and Seller does not dispute the amount of the commission or fee claimed by such broker, Seller shall pay to such broker at Closing the amount due under the lien. If Seller disputes such broker's claim then Seller shall arrange prior to Closing for the removal of such lien through the deposit of security with the court having jurisdiction over such lien or through the establishment of an escrow with the broker. If Seller fails to cause any such lien to be removed, Purchaser shall have the right, but not the obligation, to pay to such broker the amount of the lien and to deduct such amount from the Purchase Price at closing. By separate agreement, Seller has agreed to pay a brokerage commission to Patricia Gips and, without limiting the foregoing, Seller shall indemnify Purchaser from any claim for a commission or other fee claimed by Patricia Gips.

## 13.    GENERAL PROVISIONS.

13.1    The terms and conditions of this Agreement shall be binding upon, and inure to the benefit of the parties hereto and their respective successors and assigns

13.2    All representations, warranties, and indemnities contained in this Agreement or in any instrument, document or agreement delivered pursuant hereto shall merge into and not survive the delivery of the Deed and the transfer and conveyance of the Property to the Purchaser.

13.3    Any notice required or permitted hereunder shall be deemed to have been received either (a) when delivered by hand and the party giving such notice has received a signed receipt thereof, or (b) one (1) day following the date deposited with Federal Express or other recognized overnight courier, or (c) when sent by telecopy machine or (d) when sent after sending notice via e-mail, where such notice is allowed, and not having received any indication the e-mail message was not received by the intended recipient or (e) three (3) days following the date deposited in the United States mail, postage prepaid, by registered or certified mail, return receipt requested, addressed as follows (or addressed in such other manner as the party being notified shall have requested by written notice to the other party) for:

H:\re\sunrise\Billerica, MA\Documents\AOS Final.doc

14

If to the Purchaser:

    Sunrise Development, Inc.
    7902 Westpark Drive
    McLean, Virginia  22102
    Attn:  Billy Shields,
         Executive Vice President
    Telephone: (703) 273-7500
    Telecopier: (703) 744-1601

And

    Sunrise Development, Inc.
    771 East Lancaster Avenue
    Second Floor
    Villanova, PA 19085
    Attn:  Joseph F. McElwee,
         Senior Vice President
    Telephone: (610) 520-1130
    Telecopier: (610) 520-1136

With a copy to:

    Stephan K. Pahides, Esquire
    McCausland, Keen & Buckman
    Radnor Court, Suite 160
    259 N. Radnor-Chester Road
    Radnor, PA  19087
    Telephone: (610) 341-1075
    Telecopier: (610) 341-1099

If to the Seller:

    Mr. Barry Sullivan
    Mr. Thomas Patenaude
    Bradford Glen, Inc.
    P.O. Box 280
    Tewksbury, MA 01878
    Telephone: (978) 815-9886
    Telecopier: (978) 470-8053

With a copy to:

>Mark B. Johnson, Esquire
>Johnson & Borenstein, LLC
>12 Chestnut Street
>Andover, MA 01810
>Telephone: (978) 475- 4488
>Fax: (978) 475 6703

13.4    Whenever used herein, unless expressly provided otherwise, the term "days" shall mean consecutive calendar days, except that if the expiration of any time period measured in days occurs on a Saturday, Sunday, legal holiday or other day when federal offices are closed in Washington, D.C., such expiration shall automatically be extended to the next business day.

13.5    This Agreement constitutes the entire agreement between the parties concerning the Property and supersedes all prior agreements or undertakings.

13.6    This Agreement may not be modified except by the written agreement of the parties.

13.7    In the event any one or more of the provisions contained in this Agreement are held to be invalid, illegal, or unenforceable in any respect, such invalidity, illegality, or unenforceability will not affect any other provisions hereof, and this Agreement shall be construed as if such invalid, illegal, or unenforceable provision had not been contained herein.

13.8    This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective heirs, legal representatives, successors and assigns. This Agreement may not be assigned by the Seller to any person, firm, corporation or other entity, without prior written consent and approval of Purchaser. This Agreement may be assigned by Purchaser in its sole discretion (i) to any other entity which controls, is controlled by, or which is under common control with Purchaser (a "Related Entity"), or (ii) pursuant to Article 15, or (iii) to an investor entity that is controlled by an entity having at the time of the assignment a net worth of at least Seven Million Dollars ($7,000,000) (an "Investor"). An assignment by Purchaser that is not to a Related Entity or pursuant to Article 15 or an Investor shall require the written consent of the Seller, which consent shall not be unreasonably withheld, conditioned or delayed.

13.9    Any paragraph headings or captions contained in this Agreement shall be for convenience of reference only and shall not affect the construction or interpretation of any provisions of this Agreement.

13.10   This Agreement shall be governed by and construed in accordance with the laws of the Commonwealth of Massachusetts.

13.11   The parties hereby agree to indemnify and defend the Escrow Agent from any and all suits, actions or claims if the Escrow Agent acts in good faith on the written notice and direction of the parties delivered in accordance with the terms hereof.

13.13   The Effective Date of this Agreement shall be the date on which it is executed by Seller and Joseph F. McElwee on behalf of Purchaser, or, if not executed simultaneously, the date on which it is executed by the last of Seller or Joseph F. McElwee on behalf of Purchaser, which date will be inserted at the top of the first page hereof. In the event, however, that this Agreement is not countersigned by Thomas B. Newell or Billy Shields on behalf of Purchaser within 10 days of the date of this Agreement, the Agreement shall automatically terminate and be of no further force or effect.

13.14   The individuals executing this Agreement represent and warrant that they have full authority and/or have been duly authorized by their respective parties to do so on behalf of such parties.

14.   TAX FREE EXCHANGE.

Purchaser and Seller agree that, in furtherance of a so-called like-kind exchange (an "Exchange") under Section 1031 of the Internal Revenue Code of 1986, as amended, and the regulations relating thereto, Purchaser may assign (and Seller agrees to sign a notice acknowledging such assignment) this Agreement to an intermediary or an exchange accommodation titleholder, or an entity related thereto (a "Purchase Intermediary") to act in place of Purchaser as the purchaser of the Property. Such an assignment shall be made in writing by Purchaser. Upon assignment of this Agreement to a Purchase Intermediary the Purchase Intermediary shall be substituted for Purchaser as the purchaser of the Property. Seller agrees to convey the Property to the Purchase Intermediary and to render its performance of all of its obligations to the Purchase Intermediary. Seller agrees, at no cost or expense to Seller, to cooperate fully with Purchaser to accomplish the Exchange.

[Remainder of Page Left Intentionally Blank]

IN WITNESS WHEREOF, The parties hereto have executed this Agreement on the dates written below.

**SELLER:**

**BRADFORD GLEN, INC.**

Date: _____

By: _____
Thomas M. Patenaude
Its President

By: _____
Barry Sullivan
Its Treasurer

**PURCHASER:**

**SUNRISE DEVELOPMENT, INC.**

Date: _5/29/07_

By: _____
Joseph F. McElwee,
Senior Vice President

and

Date: _3/30/07_

By: _____
Name: _WILLIAM D SHIELDS_
Title: _EVP_

## EXHIBIT A

Parcel One:

That certain parcel of land situated in Billerica, in the County of Middlesex, Massachusetts situated on Andover Street, and being shown as Lot 3, Parcel 3 and Cider Mill Way on a plan entitled, "Complied Plan of Land, Andover Road, Billerica, Massachusetts, dated December 28, 2006, Scale: 1"=80', Prepared by Dresser Williams & Way, Inc., 36 Webb Brook Road, Billerica, MA  01821" recorded with the Middlesex North District Registry of Deeds, as Plan Book 223, Plan 44.

Parcel 3 contains 34.8 acres, more or less, according to said Plan, and Lot 3 contains 4.39 acres, more or less, according to said Plan.

[Excluding therefrom is Lot 3-B as shown on Plan of Land entitled "Subdivision Plan of Land, Andover Road, Billerica, Massachusetts, Prepared For Owner: Bradford Glen, Inc., 1501 Main Street, Tewksbury, MA recorded with Middlesex North District Registry of Deeds, in Plan Book _____, Plan _____, said Lot 3-B contains 1.82 acres, more or less, according to said Plan. – *This lot will be excluded if the Quitclaim Deed referred to in Section 1.3 is conveyed to the Town prior to Closing*]

Being a portion of the premises described in Deed recorded with said Registry, Book 20850, Page 254.


Parcel Two:

That certain parcel of land, situated off Andover Road in Billerica, Middlesex County, Massachusetts, being shown as Lot 2 on Plan of Land entitled: "Subdivision Plan of Land, Andover Road, Billerica, Massachusetts, Scale: 1"=60', January 5, 2007; Prepared for: Bradford Glen, Inc., P.O. Box 280, Tewksbury, MA  01876; Prepared By:  Dresser, Williams & Way, Inc., 36 Webb Brook Rd., Billerica, MA" recorded with Middlesex North Registry of Deeds, as Plan Book 223, Plan No. 72, and being bounded and described as follows:

Beginning at a point on the southeasterly corner of said Lot 2 and the southwesterly corner of Lot 1 as shown on said Plan; thence

| | |
|---|---|
| N 10°03'23" E | along said Lot 1, one hundred forty-four and 92/100 (144.92') feet to a point; thence, |
| N 07°53'03" E | still along said Lot 1, one hundred seventy-one and 85/100 (171.85') feet to a point; thence, |
| N 86°41'11" E | along land now or formerly of Pendleton and now or formerly of Cuoco, two hundred sixty-nine and 89/00 (269.89') feet to a point; thence, |

| | |
|---|---|
| S 00° 54'48"E | along land now or formerly of Pendergast, one hundred fifty-four and 12/100 (154.12') feet to a point; thence, |
| S 70° 58'58" E | still along said Pendergast land, two hundred seventy-seven and 43/100 (277.43') feet to a point; thence, |
| S 72° 16'37"E | still along said Pendergast land and land now or formerly of Blinn, four hundred ninety-two and 07/100 (492.07') feet to a point; thence, |
| S 72° 12'28"E | still along said Blinn land, one hundred ninety-nine and 45/100 (199.45') feet to a point; thence, |
| S 11° 37'01"W | along land now or formerly of Grivers, seventy-nine and 90/100 (79.90') feet to a point; thence, |
| S 08° 50'55"W | along land now or formerly of Lepore, two hundred seventeen and 14/100 (217.14') feet to a point; thence, |
| N 69° 17'38"W | along land now or formerly of Capobianco, forty-two and 10/100 (42.10') feet to a point; thence, |
| N 71° 56'41"W | still along said Capobianco land, two hundred eight and 27/100 (208.27') feet to a point; thence, |
| N 70° 20'02"W | still along said Capobianco land, forty-one and 82/100 (41.82') feet to a point; thence, |
| N 69° 10'46"W | still along said Capobianco land, fifty-eight and 44/100 (58.44') feet to a point; thence, |
| N 81° 37'27"W | still along said Capobianco land, fourteen and 26/100 (14.26') feet to a point; thence, |
| N 71° 01'15"W | still along said Capobianco land, two hundred four and 53/100 (204.53') feet to a point; thence, |
| N 68° 04'53"W | still along said Capobianco land, thirty-three and 71/100 (33.71') feet to a point; thence, |
| N 81° 14'38"W | still along said Capobianco land, sixteen and 17/100 (16.17') feet to a point; thence, |
| N 82° 54'45"W | still along said Capobianco land, ten and 10/100 (10.10') feet to a point; thence, |

| | |
|---|---|
| N 71°39'52"W | still along said Capobianco land, two hundred one and 57/100 (201.57') feet to a point; thence, |
| N 71° 42'50"W | still along said Capobianco land, one hundred ninety-five and 10/100 (196.10') feet to a point; thence, |
| N 71° 11'25"W | still along said Capobianco land, one hundred sixty-six and 65/100 (166.65') feet to a point; thence, |
| N 55° 43'58"W | still along said Capobianco land, seventy-four and 62/100 (74.62') feet to the point of beginning. |

Said Lot 2 contains 388,660 square feet, more or less, according to said Plan.

Being the same premises described in Deed recorded with said Registry, Book 20923, Page 137.

EXHIBIT B

## RESTRICTIVE COVENANTS

We, Donald F. MacDonald and Phyllis A. MacDonald of Billerica, Middlesex County, Massachusetts, Romolo E. Capobianco of said Billerica, Fay Capobianco of Fairlee, Vermont, formerly of said Billerica and Romolo Capobianco as Trustee of M.E.G. Trust a/k/a M.E.G. Realty Trust u/d/t dated 9-25-77 and recorded with Middlesex North Registry of Deeds, Book 2245, Page 256, in consideration of $1.00 and other valuable consideration paid do hereby declare for the benefit of The Inhabitants of the Town of Billerica, a municipal corporation with its offices at 365 Boston Road, Billerica, MA 01821, as appurtenant to Lot B on Rezoning Plan of Land in Billerica, Mass. prepared for Romolo Capobianco, dated March 24, 1997, and recorded herewith, that so much of our land situated on said Lot B and marked "8.88 Acres No. Build Area" (hereinafter "Restricted Area") shall remain in its natural state and accordingly, but without limiting the generality of the foregoing:

1.) No man-made nor engineered object, structure, or improvement including, without limitation, building, road, fence, pole, post, pipe, conduit or wire shall be erected, constructed or placed on, over, across or under such "Restricted Area";

2.) No industrial, commercial, residential, recreational nor farming uses shall occur on the "Restricted Area";

3.) No earth materials including soil, loam, peat, sand, rock, minerals, gravel nor clay shall be excavated, removed from, or moved about the "Restricted Area;" nor shall trees or other vegetation be cut in the restricted area.

This restriction shall be enforceable by the Grantee, its designated municipal employees, agents, boards, committees or the like.

This restriction shall not be construed to prohibit within the "Restricted Area" such practices as are customarily necessary to the conservation of vegetation and woodlands it being intended to retain the "Restricted Area" in its natural scenic condition and wooded condition as of the date of the execution of this document.

Grantors further covenant and agree for the benefit of the Grantee that it will construct no greater than One Hundred Sixty-Five (165) colonial style attached or detatched residential dwelling units on the remaining portion of said Lot B (exclusive of the lot labeled "Area to be Donated" on said plan) regardless of the maximum allowable number of units permitted by the Zoning By-Laws of the Town of Billerica or any other state or municipal laws, by-laws or regulations; that the Grantors and their successors in title shall be barred from using salt to treat any roadways or driveways to be constructed to service said units, and that the "85 Foot No Build Zone," as shown on said plan shall be governed by the requirements of Billerica Zoning By-law Section 5.16.C regardless if a portion of said land is later developed as traditional single family homes.

This Agreement is not enforceable unless recorded with a valid Special Permit Decision authorizing the construction of One Hundred Sixty Five (165) "elderly housing" units pursuant to Billerica Zoning By-Laws, Section 5.16. over a maximum period of ten (10) years.

For Grantee's title see deeds recorded with Middlesex North Registry of Deeds at Book 2436, Page 75, Book 2598, Page 27, Book 2598, Page 31, and Book 2989, Page 227, Book 2598, Page 29 and Book 2366, Page 636.

Witness our hands and seals this _22nd_ day of May, 1997.

_Donald F. MacDonald_      _Phyllis A. MacDonald_
Donald F. MacDonald          Phyllis A. MacDonald

_Romolo E. Capobianco_      _Fay Capobianco_
Romolo E. Capobianco         Fay Capobianco

M.E.G. TRUST

_Romolo E. Capobianco, Jr._
Romolo E. Capobianco, Trustee

## COMMONWEALTH OF MASSACHUSETTS

May _12_, 1997

Middlesex, ss.

Then personally appeared Donald F. MacDonald and Phyllis A. MacDonald, Romolo B. Capobianco, individually and as Trustee as aforesaid and acknowledged the foregoing to be their free act and deed before me.

Stephen J. Lentine, Notary Public
My commission expires:  8/9/02

## COMMONWEALTH OF MASSACHUSETTS

May _22_, 1997

Middlesex, ss.

Then personally appeared before me, Fay Capobianco and acknowledged the foregoing instrument to be her free act and deed, before me.

Notary Public
My commission expires:  8/9/02

FROM :KILIAN AND LENTINE          FAX NO. :978-667-0663          Dec. 29 2006 10:57AM P7



EXHIBIT C

· QUITCLAIM DEED

I, Romolo E. Capobianco, of Billerica, Middlesex County, Massachusetts, for consideration paid of One ($1.00) Dollars,

GRANT TO:  The Inhabitants of the Town of Billerica,
a municipal corporation with offices at
365 Boston Road, Billerica, MA

*WITH QUITCLAIM COVENANTS*

The land in Billerica, Middlesex County, Massachusetts, shown as "Area to be Donated" on a Rezoning Plan of Land in Billerica, MA, dated March 24, 1997, and recorded herewith. Said land is bound as shown on said plan as follows:

| | |
|---|---|
| NORTHERLY: | by land of owners unnamed 300.69 feet; |
| EASTERLY: | by land of owners unnamed, 430+/- feet; |
| SOUTHERLY: | by land of owners unnamed, 320+/- feet; |
| WESTERLY: | by Cider Mill Way, 188.67 feet; and |
| NORTHERLY: | again by Cider Mill Way, 41.66 feet. |

Said conveyance is conditional upon the Grantee utilizing the land herein conveyed for a senior citizen center or related elder services facility or purpose, failing which the land shall revert to the Grantor.

This conveyance is void unless recorded with a valid Special Permit Decision from the Billerica Zoning Board of Appeals authorizing the construction of One Hundred Sixty-Five (165) "elderly housing" units pursuant to Billerica Zoning By-Laws Section 5.16. over a maximum period of ten (10) years.

For Grantor's title see deed recorded with Middlesex North District Registry of Deeds in Book 2366, Page 636.

Witness my hand and seal this _22_ day of May, 1997.

_____
Romolo E. Capobianco

THE COMMONWEALTH OF MASSACHUSETTS

May _22_, 1997

Middlesex, ·

Then personally appeared the above-named Romolo E. Capobianco and acknowledged the foregoing instrument to be his free act and deed.

_____
Stephen J. Lentine, Notary Public
My commission expires: 8/9/02

FROM :KILIAN AND LENTINE          FAX NO. :978-667-0663          Dec. 29 2006 10:58AM  P9



REZONING PLAN OF LAND IN BILLERICA, MA - MARCH 24, 1997

## EXHIBIT D

## ESCROW AGREEMENT

This Escrow Agreement is entered into this _____ day of March, 2007, by and between First American Title Insurance Company ("Escrow Agent"), Bradford Glen, Inc., a Massachusetts corporation ("Seller") and Sunrise Development, Inc., a Virginia corporation ("Purchaser").

WHEREAS, Purchaser has contracted to purchase certain real property from Seller, and Seller has contracted to sell such property to Purchaser, which property is on and near Andover Road, Billerica, Massachusetts; and

WHEREAS, the parties have requested the Escrow Agent hold the earnest money deposit for the purchase of said property in accordance with the terms and conditions of the Purchase and Sale Agreement between Seller and Purchaser dated March __, 2007 (the "Purchase and Sale Agreement"), as supplemented by the terms and conditions hereof.

NOW, THEREFORE, for and in consideration of the premises and undertakings herein made, and intending to be legally bound hereby, the parties agree as follows:

1.      Purchaser and Seller hereby appoint Escrow Agent as custodial agent to hold the aforesaid deposit in the amount of Seventy-Five Thousand Dollars ($75,000) together with such additional amounts as may be added by Purchaser.  Upon receipt of an executed W-9 Form stating the Federal Tax Identification Number of Purchaser, said sums shall be invested in an interest bearing account insured by the FDIC, and all interest accruing thereon shall be held as part of the deposit hereunder.

2.      Escrow Agent shall apply the funds hereunder according to the terms of the Purchase and Sale Agreement.  In the event any dispute arises with respect to the disbursement of funds held hereunder, whether such dispute arises between the parties hereto or between the parties hereto and other persons, Escrow Agent shall not make such disbursement of delivery, but in such event shall hold the Deposit until receipt by the Escrow Agent of authorization, in writing signed by all persons having an interest in said dispute directing the disposition of the deposit or in the absence of such authorization the Escrow Agent is authorized to interplead such disputes into a court of competent jurisdiction.  In such case, Escrow Agent shall be entitled to its costs incurred on account of such action, including reasonable attorneys' fees, which amounts shall be paid from the funds held pursuant hereto.

3.      Escrow Agent shall not be liable to any party for its actions in performing its functions hereunder (unless Escrow Agent is negligent or in breach of the Purchase and Sale Agreement or this Agreement), and the parties shall hold Escrow Agent harmless on account of any such liability.  Escrow Agent assumes no responsibility for, nor will Escrow Agent be liable for, any loss arising because the deposit amount exceeds such amounts as may be insured by the FDIC.

4.      Each party represents to the others that it has the full authority to enter into this Agreement. This Agreement shall be governed by the laws of the Commonwealth of Massachusetts.

5.      Notices to Escrow Agent shall be sent to:  First American Title Insurance Company, National Commercial Services Division, 1025 Connecticut Avenue, N.W., Suite 709, Washington, D.C., Attention: Ms. Renee Bondaroff.  All notices sent relating to this Agreement shall be sent in the manner provided for notices in the Purchase and Sale Agreement.

Agreed to as of the day and year set forth above.

First American Title Insurance Company

Date:  March ___, 2007          By: _____
                                         Authorized Agent


Sunrise Development, Inc.

Date:  March ___, 2007          By: _____
                                         Susan Timoner, Esq.


Bradford Glen, Inc.

Date:  March ___, 2007          By: _____
                                         Thomas M. Patenaude,
                                         President

## SCHEDULE 4

1.   Notice of Intent dated June 27, 2001

2.   Order of Conditions by Billerica Conservation Commission DEP 109-0815, recorded at Book 18511, Page 158 together with Extension Permit for Order of Conditions issued on February 23, 2005 and expires February 23, 2008, recorded at Book 18662, Page 20.

3.   Limited Subsurface Investigation-21 E Report of Jaworski Geotech, Inc. dated April 1, 1998

4.   Hydrogeologic Investigation by Pease, Snowe & Associates, Inc. dated March 11, 2002

5.   Results of Baseline Ground Water Quality Analysis by Pease, Snow & Associates, Inc. dated November 15, 2002

6.   Board of Health Approval of Bradford Glen Condominium Development Conditions, Variance No. 05-051-60-006

7.   Drainage Maintenance Trust together with Operation & Maintenance Agreement

8.   Sewer Flow Test Report by Severn Trent Pipeline Services, Inc. prepared for Williams, Dresser & Way, April-May 2004

9.   Sewer Extension Permit from the Commonwealth of Mass. DEP No. W016017 issue September 8, 2005

10.  EIR Approval dated June 14, 2002

11.  Traffic Study as referred to in EIR Approval letter of June 14, 2002

12.  Site Plan Special Permit issued by the Town of Billerica Planning Board April 1, 2002 and recorded at Book 19515, Page 38

13.  Site Plan Special Permit Extension issued by the Town of Billerica on July 11, 2005 extending special permit dated April 12, 2002 to December 3, 2007 (2 years from December 3, 2005, the second anniversary of the date on which their appeal was resolved), said extension recorded at Book 19515, Page 67.

14.  Cider Mill Way Road Construction Plan (B-2) Decision by the Town of Billerica Planning Board Office issued October 7, 2002

15.  Agreement among MacDonald, Capobianco & Inhabitants of the Town of Billerica together with Restrictive Covenant (Covenant is to be recorded)

16.  Letter report prepared by SAK Environmental, LLC dated January 30, 2007 regarding its review of the environmental conditions of the Property

17.  Groundwater Analysis Report-Cider Mill Way prepared by Frontier Research dated March 6, 2007

18.  Letter Report prepared by Norse Environmental Services, Inc. dated March 16, 2007

19.  Copies of documents from the Building Department's files related to the Court ordered clean-up referenced in the Jaworski Geotech, Inc. report (Please note that these documents do not represent a complete copy of Building Dept. file on the Property)

20.  Letter from M.S. Foss to R.E. Capobianco dated January 2, 2007 re: removal of personal property

# EXHIBIT B

**STANDARD FORM**
**PURCHASE AND SALE AGREEMENT**

From the Office of:
KILIAN & LENTINI
409 Boston Road
Billerica, MA  01821
(978) 667-2212

This_____ day of _____ XX, 2007

**1. PARTIES AND MAILING ADDRESSES**
*(fill in)*

Richard V. Percuoco & Diana R. Percuoco
8 Marriott Place, Billerica, MA 01821

hereinafter called the SELL, agrees to SELL and
Bradford Glen, Inc.  P.O. Box 280, Tewksbury, MA  01876

hereinafter called the BUYER or PURCHASER, agrees to BUY, upon the terms hereinafter set forth the following described premises:  Thirty Foot Sewer and Water Easement over Seller's land located at 8 Marriott Place, Billerica, MA  as shown on Raymond Engineering Services Plan of 6/21/02 attached hereto.  For Title reference purposes see MNDRD Book #3812 Page 262

**2. DESCRIPTION**
*(fill in and include title reference)*

**3. BUILDINGS, STRUCTURES, IMPROVEMENTS, FIXTURES**
*(fill in or delete)*

but excluding                                                           easement*

**4. TITLE DEED**
*Include here by specific reference any restrictions, easements, rights and obligations in party walls not included in (b), leases, municipal and other liens, other encumbrances, and make provision to protect SELLER against BUYER's breach of SELLER's covenants in leases, where necessary.*

Said premises are to be conveyed by a good and sufficient quitclaim deed running to the BUYER, or to the nominee designated by the BUYER by written notice to the SELLER at least seven            days before the deed is to be delivered as herein provided, and said deed shall convey a good and clear record and marketable title thereto, free from encumbrances, except

(a) Provisions of existing building and zoning laws;
(b) Existing rights and obligations in party walls which are not the subject of written agreement;
(c) Such taxes for the then current year as are not due and payable on the date of the delivery of such deed;
(d) Any liens for municipal betterments assessed after the date of this agreement;
(e) Easements, restrictions and reservations of record, if any, so long as the same do not prohibit or materially interfere with the ~~current use of the premises~~ proposed  easement  use
*(f)    * in the form attached hereto as Addendum B (hereinafter "deed")

**5. PLANS**

**6. REGISTERED TITLE**

In addition to the foregoing, if the title to said premises is registered, said deed shall be in form sufficient to entitle the BUYER to a Certificate of Title of said premises, and the SELLER shall deliver with said deed all instruments, if any, necessary to enable the BUYER to obtain such Certificate of Title.

**7. PURCHASE PRICE**
*(fill in); space is allowed to write out the amounts if desired*

The agreed purchase price for said premises is Twenty- Thousand & 00/100---
Five                                                 dollars, of which

| | | |
|---|---|---|
| $ | 5,000.00 | have been paid as a deposit this day and |
| $ | 20,000.00 | are to be paid at the time of delivery of the deed in cash, or by certified, cashier's, treasurer's or bank check(s). |
| $ | 25,000.00 | TOTAL |

COPYRIGHT © 1979, 1984 1986, 1987, 1988, 1991
GREATER BOSTON REAL ESTATE BOARD



All rights reserved. This form may not be copied or reproduced in whole or in part in any manner whatsoever without the prior express written consent of the Greater Boston Real Estate Board.

| | | |
|---|---|---|
| 8. | TIME FOR PERFORMANCE; DELIVERY OF DEED *(fill in)* | Such deed is to be delivered at   10:00   o'clock   A.M. on the   **\*\***   day of <br> 19   , at the |

Registry of Deeds, unless otherwise agreed upon in writing. It is agreed that time is of the essence of this agreement. ~~xxxxxxxxxxxxxxxxxxxxxxxxxxxx~~

9. POSSESSION AND CONDITION OF PREMISE. *(attach a list of exceptions, if any)*

Full possession of said ~~premises~~ free of all tenants and occupants, except as herein provided, is to be delivered at the time of the delivery of the deed, said premises to be then (a) in the same condition as they now are, reasonable use and wear thereof excepted, and (b) not in violation of said building and zoning laws, and (c) in compliance with provisions of any instrument referred to in clause 4 hereof. The BUYER shall be entitled personally to inspect said premises prior to the delivery of the deed in order to determine whether the condition thereof complies with the terms of this clause. * the easement area

10. EXTENSION TO PERFECT TITLE OR MAKE PREMISES CONFORM *(Change period of time if desired).*

If the SELLER shall be unable to give title or to make conveyance, or to deliver possession of the premises, all as herein stipulated, or if at the time of the delivery of the deed the premises do not conform with the provisions hereof, then any payments made under this agreement shall be forthwith refunded and all other obligations of the parties hereto shall cease and this agreement shall be void without recourse to the parties hereto, unless the SELLER elects to use reasonable efforts to remove any defects in title, or to deliver possession as provided herein, or to make the said premises conform to the provisions hereof, as the case may be, in which event the SELLER shall give written notice thereof to the BUYER at or before the time for performance hereunder, and thereupon the time for performance hereof shall be extended for a period of thirty   -30-   days.

11. FAILURE TO PERFECT TITLE OR MAKE PREMISES CONFORM, etc.

If at the expiration of the extended time the SELLER shall have failed so to remove any defects in title, deliver possession, or make the premises conform, as the case may be, all as herein agreed, or if at any time during the period of this agreement or any extension thereof, the holder of a mortgage on said premises shall refuse to permit the insurance proceeds, if any, to be used for such purposes, then any payments made under this agreement shall be forthwith refunded and all other obligations of the parties hereto shall cease and this agreement shall be void without recourse to the parties hereto.

12. BUYER's ELECTION TO ACCEPT TITLE

The BUYER shall have the election, at either the original or any extended time for performance, to accept such title as the SELLER can deliver to the said premises in their then condition and to pay therefore the purchase price without deduction, in which case the SELLER shall convey such title, except that in the event of such conveyance in accord with the provisions of this clause, if the said premises shall have been damaged by fire or casualty insured against, then the SELLER shall, unless the SELLER has previously restored the premises to their former condition, either

(a) pay over or assign to the BUYER, on delivery of the deed, all amounts recovered or recoverable on account of such insurance, less any amounts reasonably expended by the SELLER for any partial restoration, or

(b) if a holder of a mortgage on said premises shall not permit the insurance proceeds or a part thereof to be used to restore the said premises to their former condition or to be so paid over or assigned, give to the BUYER a credit against the purchase price, on delivery of the deed, equal to said amounts so recovered or recoverable and retained by the holder of the said mortgage less any amounts reasonably expended by the SELLER for any partial restoration.

13. ~~ACCEPTANCE OF DEED~~

~~The acceptance xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx~~

14. ~~USE OF MONEY TO CLEAR TITLE~~

~~To enable the SELLER xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxdeed.~~

15. INSURANCE *Insert amount (list additional types of insurance and amounts as agreed)*

Until the delivery of the deed, the SELLER shall maintain insurance on said premises as follows:

| Type of Insurance | Amount of Coverage |
|---|---|
| (a) Fire and Extended Coverage | *\$ As presently insured.* |
| (b) | |

16. ADJUSTMENTS *(list operating expenses, if any, or attach schedule)*

~~xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx~~

\*\* immediately prior to the Seller's refinance closing
   as described in Article 2 of Addendum A

17. **ADJUSTMENT OF UNASSESSED AND ABATED TAXES**

XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

18. **BROKER's FEE** *(fill in fee with dollar amount or percentage; also name of Brokerage firm(s))*

XXXXXXXXXXXXXXXXXXXXXXXXXXX XXXXXXXXXXXXXXX

XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

19. **BROKER(S) WARRANTY** *(fill in name)*

XXXXXXXXXXXXXXXXXX XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

20. **DEPOSIT** *(fill in name)*

All deposits made hereunder shall be held in escrow by SELLER'S Counsel Joseph Impemba as escrow agent subject to the terms of this agreement and shall be duly accounted for at the time for performance of this agreement. In the event of any disagreement between the parties, the escrow agent may retain all deposits made under this agreement pending instructions mutually given by the SELLER and the BUYER.

21. **BUYER's DEFAULT; DAMAGES**

If the BUYER shall fail to fulfill the BUYER's agreements herein, all deposits made hereunder by the BUYER shall be retained by the SELLER as liquidated damages XXXXXXXXXXXXXXXXXXXXXXXXXX XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX XXXXX

22. **RELEASE BY HUSBAND OR WIFE**

The SELLER's spouse hereby agrees to join in said deed and to release and convey all statutory and other rights and interests in said premises.

23. **BROKER AS PARTY**

XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

24. **LIABILITY OF TRUSTEE, SHAREHOLDER, BENEFICIARY, etc.**

If the SELLER or BUYER executes this agreement in a representative or fiduciary capacity, only the principal of the estate represented shall be bound, and neither the SELLER or BUYER so executing, nor any shareholder or beneficiary of any trust, shall be personally liable for any obligation, express or implied, hereunder.

25. **WARRANTIES AND REPRESENTATIONS** *(fill in); if none, state "none"; if any listed, indicate by whom each warranty or representation was made*

The BUYER acknowledges that the BUYER has not been influenced to enter into this transaction nor has he relied upon any warranties or representations not set forth or incorporated in this agreement or previously made in writing, except for the following additional warranties and representations, if any, made by either the SELLER or the Broker(s):

26. **MORTGAGE CONTINGENCY CLAUSE** *(omit if not provided for in Offer to Purchase)*

XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

| 27. | CONSTRUCTION OF AGREEMENT | This instrument, executed in multiple counterparts, is to be construed as a Massachusetts contract, is to take effect as a sealed instrument, sets forth the entire contract between the parties, is binding upon and enures to the benefit of the parties hereto and their respective heirs, devisees, executors, administrators, successors and assigns, and may be cancelled, modified or amended only by a written instrument executed by both the SELLER and the BUYER. If two or more persons are named herein as BUYER, their obligations hereunder shall be joint and several. The captions and marginal notes are used only as a matter of convenience and are not to be considered a part of this agreement or to be used in determining the intent of the parties to it. |
|---|---|---|
| 28. | LEAD PAINT LAW | ~~The parties acknowledge that...~~ |
| 29. | SMOKE DETECTORS | ~~The SELLER shall...~~ |
| 30. | ADDITIONAL PROVISIONS | The initialed riders, if any, attached hereto, are incorporated herein by reference.<br><br>See Addendum A & B attached hereto and incorporated herein by reference. |

FOR RESIDENTIAL PROPERTY CONSTRUCTED PRIOR TO 1978, BUYER MUST ALSO HAVE SIGNED LEAD PAINT "PROPERTY TRANSFER NOTIFICATION CERTIFICATION"

NOTICE: This is a legal document that creates binding obligations. If not understood, consult an attorney.

SELLER (or spouse) Richard V. Percuoco _____   SELLER Diane R. Percuoco _____

BUYER Thomas Patenaude, President _____   BUYER Barry Sullivan, Treasurer _____

_____ Broker _____

---

## EXTENSION OF TIME FOR PERFORMANCE

Date _____

The time for the performance of the foregoing agreement is extended until _____ o'clock _____ M. on the _____ day of _____ 19 _____, time still being of the essence of this agreement as extended. In all other respects, this agreement is hereby ratified and confirmed.
This extension, executed in multiple counterparts, is intended to take effect as a sealed instrument.

SELLER (or spouse) _____   SELLER _____

BUYER _____   BUYER _____

_____ Broker(s) _____

**ADDENDUM "A"**

**Percuoco et al to Bradford Glen, Inc.**

**Easement – 8 Marriott Place**

**Billerica, MA**

(1)   Sellers at closing shall provide an original Easement Document as shown on the attached Addendum "B", executed by both the Sellers.

(2)   Seller upon the full execution of this Agreement by all parties agrees to immediately apply for and diligently seek a refinance closing of the Premises to pay off any and all existing mortgages or other monetary encumbrances upon the same. The closing of this transaction shall take place simultaneously with, or just prior, to said refinance closing and in either event the easement document referenced in Paragraph 1 of this Addendum "A" shall be recorded prior to the new mortgage to be granted by the Sellers in connection with said refinance transaction.

(3)   In addition to the purchase price stated in paragraph # 7 of the preprinted Agreement, Buyer agrees to pay all costs associated with this transaction (including recording fees, excise stamps and plan preparation), all costs and expenses incurred for the construction of the easement pursuant to this Agreement and the plan to be recorded, as well as the costs and expenses referenced in paragraphs 4, 5, 6, 7 & 8 of this Addendum "A".

(4)   Buyer agrees to connect Seller's premises into the new sewer line simultaneous with the construction of the sewer line in a manner not to impact any structure existing on the grantor's property at the time of said connection. Seller nonetheless will pay for the town's connection fee, if any, associated with the connection of Seller's dwelling, Buyer also will remove existing injector pump, when the new line is tested and approved for connection.

(5)   Buyer will loam and seed (not hydroseed) all disturbed areas following construction with screened topsoil. Buyer further agrees to take down and subsequently reinstall Seller's existing fence following construction completion to its original location.

(6)   Buyer will stone around the portion of water main on Seller's property with a stone outfall from the main to the existing drainage ditch.

(7)   If any trees have to be removed on Seller's property Buyer will replace same with 8' white pines.

(8)   Buyer further agrees to pay the following expenses incurred, or to be incurred, by the Seller at the time of closing:

    a.   $7,500.00 towards the Seller's points and closing costs related to said refinance closing;

    b.   $2,000.00 in legal fees due to Seller's legal counsel; and

    c.   $1,000 00 in engineering fees due to Seller's consulting engineer.

(9)   All work to be provided by the Buyer under Articles 4, 5, 6, & 7 of this Addendum "A" will be performed by bonded and/or insured contractors in a good and workmanlike manner at Buyer's expense.

(10)  Other than within the cul de sac area of Mariott Place, no manholes will be constructed within the confines of the Seller's lot without their express written permission. The provisions of this Article shall survive the delivery of the deed.

(11)  The Buyer agrees that the water line shall be the further of the two lines (water and sewer) from the Seller's dwelling. The provisions of this Article shall survive the delivery of the deed.

(12)  Any provision of this Addendum "A" which is required to be performed after the date of closing shall survive the delivery and recording of the deed and shall be binding upon any future owner of the site and given to any future owner of the site other than individual unit owners.

## Addendum "B"

## SEWER AND WATER EASEMENT

KNOW ALL MEN BY THESE PRESENTS, that we RICHARD V. PERCUOCO and DIANE E. PERCUOCO, (hereinafter sometimes collectively called the "Grantors"), the owners of a certain parcel of land known as 8 Marriott Place, Billerica, Massachusetts, shown as Lot 30 in Book of Plans 183, Plan 5, recorded with Middlesex North District Registry of Deeds, and by virtue of a deed recorded with said Middlesex North District Registry of Deeds, in Book 13812, Page 262, in consideration of the Mutual Consideration contained in an Agreement with Bradford Glen, Inc. dated _____, 2007 hereby grants to Bradford Glen, Inc., its successors and assigns forever (hereinafter the "Grantee") with quitclaim covenants a thirty foot water and sewer easement shown as "Proposed 30' Water and Sewer Easement" on a plan entitled "Plan of Land in Billerica, Mass." prepared for Bradford Glen, Inc., by Raymond Engineering Service dated June 21, 2002 and recorded with said Deeds at Plan Book __ _____, Plan _____.

Said easement grant includes the right of the Grantee to construct, reconstruct, operate, maintain, renew, replace and remove underground water and sewer lines and appurtenant equipment within said easement area as well as the right to enter upon said easement area from time to time for all the foregoing purposes. Grantee agrees to provide the Grantor with forty eight (48) hours notice prior to entering the easement area other than in an emergency situation.

Grantee is obligated to fully maintain in perpetuity the water and sewer utility infrastructure in such a way as not to adversely impact any land outside of said easement area and to indemnify and hold harmless the Grantors with respect to Grantee's and/or their successors use of said easement area, as well as acknowledging Grantee's ongoing obligation to restore the land to its original condition following the installation, maintenance or repair of said water and sewer lines.

This easement burdens certain land of the Grantors described in a deed recorded at the Middlesex North District Registry of Deeds in Book 13812, Page 262, and shall be construed to run with said land and be binding on the Grantors and the Grantees as well as their successors in title to said land.

*IN WITNESS WHEREOF*, the said Richard Percuoco and Diane Percuoco, have hereunder set their hands and seals this _____ day of _____ of 2007.

_____          _____
Richard V. Percuoco                    Diane E. Percuoco

## COMMONWEALTH OF MASSACHUSETTS

Middlesex, ss

On this _____ day of _____, 2007, before me, the undersigned notary public, personally appeared the above named *Richard V. Percuoco and Diane E. Percuoco*, proved through satisfactory evidence of identification, which were _____ _____, to be the persons whose names are signed on the preceding or attached document, and acknowledged to me that they signed it voluntarily for the stated purpose.

_____
Notary Public:
My Commission Expires:



CERTIFY THAT THIS PLAN WAS
.DE IN ACCORDANCE WITH THE
ILES AND REGULATIONS OF THE
.GISTERS OF DEEDS.

_____ A. McDonald_____   6/21/02
P.L.S.                   DATE

I HEREC
ON THIS
OWNERS
SHOWN
OR WAY:
LINES F
NEW WA





## LOCUS
(N.T.S)

ACE

NOTES:

THE PURPOSE OF THIS PLAN IS TO CREATE A
30-FT WIDE UTILITY EASEMENT ACROSS LOT 30
AS SHOWN.

REFERENCE PLANS:

183-5
194-63
180-123

RECORD OWNER:

RICHARD V. PERCUOCO
DIANE E. PERCUOCO
JOAN E. NUTILE
8 MARRIOTT PLACE
BILLERICA, MA 01821

THE PROPERTY LINES SHOWN
LINES DIVIDING EXISTING
LINES OF STREETS AND WAYS
PUBLIC OR PRIVATE STREETS
ABLISHED AND THAT NO NEW
EXISTING OWNERSHIPS OR FOR

_____ 6/21/02
DATE:

### PLAN   OF   LAND
IN
### BILLERICA,   MASS.

PREPARED FOR:  BRADFORD GLEN, INC

| 40 | 0 | 40 | 80 | 120 |

SCALE: 1"=40'                            JUNE 21, 2002
FILE: UTILITY EASEMENT                DRAFT BY: PJS

# Raymond Engineering Service
574 BOSTON RD.   BILLERICA, MA
TELEPHONE NO. (978) 663-6410   FAX NO. (978) 663-6601

```
XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
X                                                                                P.01   X
X                             TRANSACTION REPORT                                         X
X                             ──────────────────               MAY-04-2007 FRI 11:42 AM  X
X      RECEIVE                                                                           X
X                                                                                        X
X   DATE  START     SENDER          RX TIME   PAGES TYPE          NOTE          M# DP X
X   MAY-04 11:38 AM 978 687 0663     4'46"     11   RECEIVE       OK                     X
X                                                                                        X
XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
```